**Robert R. MILLER, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 1:88–cv–4601.**

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 12, 1996.

J. Timothy Bender, Roetzel & Andress, Cleveland, OH, William A. Duncan, Kadish & Bender, Cleveland, OH, for Plaintiffs.

Annette G. Butler, Office of the U.S. Attorney, Cleveland, OH, for Defendant.

### OPINION & ORDER

O'MALLEY, District Judge.

The plaintiff in this case seeks a refund of over $5 million in federal estate taxes, paid by the estate of Robert R. Miller in May of 1988. The Internal Revenue Service determined that Miller's estate owed the $5 million because a certain amount of Miller's assets, which had been placed in trust, did not qualify for the marital tax deduction—a deduction of which plaintiff claims Miller intended to take advantage. Thus, the issue in this case is whether certain provisions contained in Miller's will and in a contemporaneous trust agreement disqualify a portion of the trust for the marital tax deduction al-

lowed under Section 2056(b)(7) of the Internal Revenue Code.[1]

Following a trial to the bench, the Court concludes that the portion of the trust at issue *does* qualify for the marital deduction. Accordingly, the Court finds in favor of plaintiff. Pursuant to Fed.R.Civ.P. 52(a), the Court's findings of fact and conclusions of law follow.

## I. *General Discussion*

Robert R. Miller died a wealthy man on December 18, 1984, leaving behind an estate worth approximately $13 million. He was survived by his spouse of many years, Doris A. Miller, and two adult daughters, Doris Severn Lowell and Mary J. Miller.

In late 1973 and early 1974, Miller signed a will and a trust agreement, creating a fairly sophisticated estate plan. The general outlines of this estate plan were as follows: (1) Miller bequeathed and devised his personalty and residential realty to his wife, or to his daughters if his wife predeceased him; (2) the residue of Miller's estate "poured over" into an existing inter vivos trust; (3) the trust was split into a "marital trust" and a "non-marital trust;" (4) Mrs. Miller was the named beneficiary of the marital trust, which was funded in such a way to achieve the maximum marital estate tax deduction then possible under current law, i.e. 50% of the value of the estate; and (5) the two daughters were the named beneficiaries of the non-marital trust, which was funded with the remaining assets. The residue that was to pour over into the trust was expected to be comprised mainly of shares of stock in two closely-held corporations, Precision Metalsmiths and Pre–Vest, which were formed and run by Miller.

Beyond these general outlines, two relatively pedestrian aspects of Miller's 1973 estate plan are notable in the context of this

case. First, in the 1973 Trust Agreement document, the marital trust was listed and addressed first and was, thus, called the "A trust;" the non-marital trust was called the "B trust." Second, the 1973 Trust Agreement contained a boilerplate "spendthrift clause." Spendthrift provisions generally are designed to prevent a beneficiary from alienating his own interests in trust assets through pledging those interests, or the trust assets themselves, for the benefit of his creditors. If a beneficiary attempts to alienate or encumber trust assets in any fashion, or if a creditor of a beneficiary seeks to call upon trust assets for satisfaction of the debt, the beneficiary forfeits the right to enjoy the income from those assets except, and to the extent, deemed necessary for the support and maintenance of the beneficiary and his family. The spendthrift provision in this case was quite typical in its intent and proposed operation. A single sentence in the Trust Agreement limited the spendthrift clause, however, making it applicable to the non-marital trust only.

In 1982, Miller undertook to update his estate plan. It is clear from the evidence submitted at trial that the stimulus for this update was the passage by Congress of the Economic Recovery Tax Act of 1981 ("ERTA"). ERTA made available to taxpayers certain new techniques to minimize their estate taxes. Before the passage of ERTA, the tax code allowed a maximum marital deduction of 50% of the value of the estate. After ERTA, the tax code allowed an unlimited marital deduction.

ERTA also recognized a new form of property interest that qualified for the marital deduction—the qualified terminable interest property ("QTIP"). This change was significant; pre-ERTA, the tax code only permitted use of the marital deduction in circumstances where the surviving spouse was given com-

---

1. It is worth noting the reasons why the Court only now rules on this issue, which was initially raised when plaintiff filed this case in December of 1988. After a slow start, this case was referred to mediation and reported as settled in June of 1993. Actual dismissal of the case, however, was conditioned upon approval of the settlement by the Assistant Attorney General of the Tax Division of the U.S. Dept. of Justice and the Joint Committee on Internal Revenue of the U.S. Congress. The Assistant Attorney General eventually withheld settlement authority and the case was reopened just before it was transferred, in November of 1994, to the undersigned's docket. Extensive and excellent briefing thereafter brought this case to trial readiness only this summer.

plete control over the disposition of the property at the time of the surviving spouse's death. The QTIP exception permitted a grantor to retain control over the ultimate disposition of certain assets that were effectively passed through the estate of the surviving spouse, who received the benefit of the marital deduction in the process. For property to qualify under the QTIP exception, the surviving spouse's interest in the property during the period it is effectively passing through the surviving spouse's estate must be both substantial and exclusive. Thus, QTIP property must: (1) entitle the surviving spouse to all the income therefrom, payable at least annually; and (2) not be alienable during the life of the surviving spouse.

Miller amended his Will and Trust Agreement in 1982 to take advantage of these new tax provisions. The general outlines of Miller's estate plan, however, remained largely unchanged. As before, Miller bequeathed and devised his personalty and residential realty to his wife, or to his daughters if his wife predeceased him. As before, the residue of Mr. Miller's estate "poured over" into the trust. And under the amended trust agreement, the trust was again split into a "marital trust" and a "non-marital trust." The assets placed into the trust, however, were split differently than before. The 1982 Trust Agreement designated $2 million in assets to fund the non-marital trust (the beneficiaries of which were again Miller's two daughters) and the remaining assets to fund the marital trust (the beneficiary of which was again Mrs. Miller). The marital trust was designed to be a QTIP trust, so that all of the assets in the marital trust would qualify for the marital deduction. As in the 1973 estate plan, this division of Miller's assets in trust was designed to achieve the maximum marital tax deduction possible under existing law.

There were two apparently minor, but critical, differences between the 1973 Trust Agreement and the 1982 Trust Agreement. First, the 1982 Trust Agreement switched the designations so that it was the *non-marital* trust that was "Trust A" and the *marital* trust that was Trust B.[2] Second, the sentence that made the spendthrift clause applicable only to the non-marital trust and not to the marital trust was omitted from the 1982 Trust Agreement.

These differences proved serious. As noted, section 2056(b)(7) of the Internal Revenue Code provides that an asset which a decedent leaves in trust to his surviving spouse may qualify for the marital deduction (and thus escape estate taxes until the surviving spouse dies) only if it is a QTIP. Also as noted, an asset is a QTIP only if, among other things: (1) the surviving spouse alone is entitled to all the income from the asset, payable at least annually; and (2) neither the surviving spouse nor anyone else may appoint any part of the asset during the surviving spouse's life. Plaintiff in this case claims that the marital trust contained in the 1982 Trust Agreement—valued at over $10 million when Miller died—was a QTIP trust, and that therefore no taxes need be paid on that amount until Mrs. Miller's death. The IRS insists that the marital trust was not a QTIP trust, and that the estate thus owes over $5 million in taxes on that amount. The primary basis for the IRS's position is that the 1982 Trust Agreement contained a spendthrift clause that apparently was applicable to both the non-marital *and* the marital trusts. The IRS claims that, by virtue of this spendthrift clause, Mrs. Miller did not have an *unqualified* right to all the income from the marital trust assets, because her right to the income was circumscribed by the spendthrift provisions. Because Mrs. Miller did not have this unqualified right, the IRS concludes, the marital trust does not qualify as a QTIP trust and is not eligible for the marital deduction.

As a second basis for its position, the IRS notes that, under both the 1973 and 1982 Trust Agreements, the trustees had the power to pay certain expenses (most particularly, taxes) out of "Trust B" assets during Mrs. Miller's life. Because Trust B in the 1982 Trust Agreement is the *marital* trust, the IRS argues that the Trust Agreement authorizes the trustees to appoint part of the

**2.** This switch was a logical artifact of how the trust assets were split; in both the 1973 and 1982 Trust Agreements, the "remaining assets" were put into "Trust B."

assets in the marital trust during Mrs. Miller's life, thereby disqualifying the marital trust as a QTIP trust.

Plaintiff counters with several arguments of its own. First, citing *BancOhio Nat'l Bank v. United States,* 88–2 USTC (CCH) ¶ 13,776 (Ohio 1988), *Corey v. National Bank of Toledo,* 159 N.E.2d 814 (Ct.Comm.Pleas 1958), Technical Advice Memorandum 8532006, and Ohio Rev.Code § 1339.411, plaintiff argues that the provision in the 1982 Trust Agreement giving to Mrs. Miller an unrestricted right to all the income of the marital trust was a specific, affirmative dispositive provision; as such, it cannot be restricted or overridden by the boilerplate language of the spendthrift clause, which was a general, non-dispositive provision. Thus, plaintiff concludes, the spendthrift clause (however phrased) cannot be read to apply to the marital trust because it would defeat Miller's specific intent.

Second, plaintiff argues that the IRS's reading of the Trust Agreement makes some of the Trust language ambiguous and/or surplusage, so that it is appropriate to examine extrinsic evidence of Miller's intent. Plaintiff argues that this extrinsic evidence shows Miller intended the marital trust to qualify as a QTIP trust, and that he would have succeeded in that goal but for scrivener's error. Particularly, plaintiff claims that, in transposing the Trust A and Trust B designations, the draftsmen who revised Miller's documents made at least two errors: (1) the limitation making the spendthrift clause applicable only to the non-marital trust was omitted entirely, rather than rewritten as it should have been; and (2) the provision allowing for the payment of certain expenses from Trust B was never changed to reflect the change in the trust designations (to Trust A).

Third, plaintiff insists that, under Ohio law, the trustees did not and could not pay any expenses (taxes or otherwise) out of marital trust assets, so the marital trust was not disqualified as a QTIP trust merely because it contained language purporting to allow the trustees to make such payments from the trust property.

In resolving the issues raised by the parties, the Court is guided by several maxims of interpretation of testamentary documents. First, and most important, is that the function of a court in a case construing testamentary documents "is to determine and apply the testator's intention, as expressed in the language of the [documents] read in light of the circumstances surrounding [their] execution." *Casey v. Gallagher,* 11 Ohio St.2d 42, 227 N.E.2d 801 (1967). Second is that the testamentary documents must be construed within their four corners and *without* regard to extrinsic evidence, if at all possible. *Sandy v. Mouhot,* 1 Ohio St.3d 143, 438 N.E.2d 117 (Ohio 1982); *Steinbrenner v. Dreher,* 140 Ohio St. 305, 43 N.E.2d 283 (Ohio 1942). Third is that, in construing testamentary documents, a court must avoid a construction that would make superfluous an entire clause of the instrument. *Townsend's Executors v. Townsend,* 25 Ohio St. 477, 487–488 (1874) ("All the parts of the will must be construed together; and effect, if possible, must be given to every word contained in it"). Finally, in considering the provisions of such documents, the Court must construe them in a fashion that gives effect to and assumes an intention to comply with controlling law. *Solomon v. Central Trust Co., N.A.,* 63 Ohio St.3d 35, 584 N.E.2d 1185 (1992) (court must presume that the testator was aware of, and tried to follow, then existing law).

The first question this Court must address, therefore, is whether it can divine Miller's testamentary intent from within the four corners of his 1982 Will and Trust Agreement alone. The Court concludes that it cannot. Despite the best efforts of both parties to explain Miller's intent as shown by the documents alone, serious ambiguities persist. Thus, the Court agrees with plaintiff that defendant's interpretation of the documents requires a construction that would render Section 5.04 of the 1982 Trust Agreement (the provision granting to Mrs. Miller an *unlimited* interest in the assets of the marital trust), at least to some extent, surplusage; yet the Court also agrees with defendant that plaintiff's interpretation requires a construction that would render Section 9.01 (the "spendthrift clause"), at least

to some extent, surplusage. In sum, neither plaintiff nor defendant has proffered an acceptable explanation of Miller's testamentary intent, as reflected in the 1982 documents *alone,* which leaves no ambiguity and forces no provisions to be treated as surplusage.

■ Given this ambiguity, it is appropriate to examine extrinsic evidence of Miller's intent. The Court concludes this extrinsic evidence shows *clearly and convincingly* that Miller did intend the marital trust to be a QTIP trust, and that Miller would have succeeded in carrying out his intent but for "scrivener's error." This scrivener's error was made by the drafter of the 1982 documents, Mr. Keith Kern.

In so concluding, the Court rejects the government's theory regarding Miller's testamentary intent. The government went to great lengths, in its arguments at trial and in its briefs, to portray Miller as a paternalistic and untrusting deceased spouse whose *primary* goal was to maintain control over the two companies he had founded, long after his demise. The government argues that the changes Miller made in his 1982 estate plan were principally effected so that Miller could place his accountant and friend, Mr. Levy, in charge of the two companies; in this way, the companies could continue to be operated in the fashion Miller desired, even after Miller died.

Indeed, in its post trial brief, the government contends Miller was so obsessed with this goal that he pursued it without regard to—indeed, in knowing disregard of—the import it would have on his estate's ability to take advantage of the tax benefits newly made available under ERTA. This contention asks the Court to overlook the overwhelming evidence that the passage of ERTA was what prompted Miller to rewrite his estate plan in the first place. In sum, the Court's close review of the government's admittedly well-argued theory reveals that it is no more than just that—a theory, unsupported by evidence. In fact, the government's theory was contradicted by the vast majority of the testimony and documentary evidence adduced at trial. The government attempts to address its lack of direct supporting evidence by suggesting that: (1) certain of the plaintiff's evidentiary documents were forged by plaintiff, Mr. Kern, or plaintiff's current counsel; and (2) Mr. Kern, the plaintiff's primary witness, perjured himself in the interest of self protection. Neither contention is supportable nor accepted by the Court.

Rather, the Court accepts the theory proffered by plaintiff, which was clearly proved at trial. The Court is convinced that, in 1982, when Kern amended Miller's 1973 Will and Trust Agreement, Kern was inattentive to certain details. This inattention led to: (1) the "flip-flopping" of the correlation between "Trust A" and "Trust B" to the marital and non-marital trusts, respectively, without accurately accounting for this flip-flop in each and every reference to the trusts; and (2) the omission of the sentence limiting the reach of the spendthrift clause to only the non-marital trust. These two scrivener's errors were inadvertent in that they were intended neither by Kern nor Miller; the errors were attributable to the gremlins inherent in repeated wordprocessing revisions and unclear handwritten editorial marks. Furthermore, these two errors leave the 1982 Trust Agreement ambiguous on its face; Miller's testamentary intent can only be discovered through reference to extrinsic evidence. Finally, the extrinsic evidence shows convincingly that Miller intended to qualify the marital trust as a QTIP trust, and would have done so but for Kern's inattention: if Kern had not made the two errors, Mrs. Miller alone would have been entitled to all the income from the marital trust, payable at least annually, and no one could have appointed any part of the marital trust during Mrs. Miller's life. Accordingly, the marital trust qualifies as a QTIP trust, the QTIP trust qualifies as a marital deduction, and plaintiff's prayer for an estate tax refund is well-taken. Formal findings of fact and conclusions of law, in addition to those stated above, follow.

## II. Findings of Fact and Conclusions of Law.

### A. Findings of Fact

1. Robert R. Miller ("Decedent"), whose Estate is the subject of this case, died on December 18, 1984.

2. At the time of his death, Decedent was a resident of Cuyahoga County, Ohio.

3. As of Decedent's date of death, he was legally married to Doris A. Miller; thus, Doris A. Miller is the surviving spouse of the Decedent.

4. Decedent was also survived by two adult daughters, Doris Severn Lowell and Mary J. Miller.

5. As of the date of his death, Decedent had in place an estate plan consisting of, *inter alia,* a Will and a Trust Agreement, both of which were executed on October 13, 1982, (the "1982 Will" and "1982 Trust Agreement," respectively).

6. Keith W. Kern drafted both the 1982 Will and 1982 Trust Agreement. Mr. Kern was, at the time he drafted these documents, an associate in a Cleveland area law firm that had handled the Millers' estate planning for many years.

7. The 1982 documents drafted by Mr. Kern served to revise Miller's existing estate plan, most recently set out before then in documents drafted in 1972 and 1973. The impetus for Miller's revision of his estate plan was Congress's passage of the Economic Recovery Tax Act of 1981 ("ERTA").

8. The 1982 Will provided, in general, that all of the Decedent's household goods, clothing, automobiles, and real estate should pass to his surviving spouse.

9. The 1982 Will further provided, in Item V:

I give, devise and bequeath all the residue of my property, of whatsoever character and wheresoever situate, to the Trustees under a certain Trust Agreement which I have heretofore entered into with myself and HENRY LEVY of University Heights, Ohio, as Trustees, under date of the 21st day of December, 1973, as amended on the 13th day of October, 1982, to be held, managed and disposed of in accordance with the terms and provisions of said Trust Agreement as the same may exist at the time of my death. If necessary to give effect to this Item, but not otherwise, said Trust Agreement is incorporated herein by reference.

If, when my executor proposes to make any distribution to the trustees under my said Trust Agreement, any beneficiary is entitled to distribution from the trustees, my Executor may make distributions directly to such beneficiary.

10. The 1982 Will further provided in Item VI:

All estate, inheritance and succession taxes, both state and federal, imposed or payable by reason of my death, and interest and penalties thereon, with respect to all property constituting my gross estate for tax purposes, whether or not such property passes under this Will, shall be paid out of my residuary estate or out of assets received by my Executor from the trustees under the said Trust Agreement hereinabove in Item V referred to, without any right or duty on my Executor to seek or obtain contribution or reimbursement from any person or property; provided, however, that any of such taxes paid from my residuary estate shall be charged to the principal of that portion thereof ultimately forming a part of Trust B under the aforesaid Trust Agreement.

11. In Item VIII of the 1982 Will, Henry Levy was appointed Executor and James Conway was appointed successor Executor.

12. Henry Levy was Decedent's certified public accountant, friend, and long-time advisor. James Conway was a partner in Mr. Kern's firm and was acquainted both professionally and personally with the Millers for many years.

13. The 1982 Trust Agreement replaced and updated a prior trust agreement the Decedent had executed on December 21, 1973.

14. The 1982 Trust Agreement contained, in Section 5 of the document, specific affirmative and dispositive provisions. These provisions divided the trust assets into two separate trusts. The first separate trust was Trust A, which was funded in the amount of $2,000,000 and which was for the benefit of Mr. and Mrs. Miller's two daughters. The second separate trust was Trust B, which was funded with the remaining assets of

the estate for the benefit of Decedent's surviving spouse. With reference to Trust B, Section 5.03 of the 1982 Trust Agreement reads as follows:

The balance of the trust estate remaining after satisfying the preceding provisions of this Article shall be allocated to Trust B. During the Grantor's wife's lifetime:

(a) Commencing as of the Grantor's death, the Trustees shall pay the net income derived from Trust B in convenient installments, not less often than quarterly, to the Grantor's wife during her lifetime.

(b) The Trustees may pay to the Grantor's wife, or apply for her benefit, such amounts of the principal of Trust B as they may from time to time deem necessary or proper to provide suitably for her comfort, welfare, health and enjoyment, if, in the judgment of the Trustees, the Grantor's wife's income and means of support hereunder and from other sources known to the Trustees are not sufficient for such purposes.

(c) Upon the death of the Grantor's wife, Trust B shall be added to Trust A, except that unless the Grantor's wife directs otherwise by her Will, the Trustees shall first pay from the principal of the marital portion, of Trust B, directly or to the legal representative of the Grantor's wife's estate as the Trustees deem advisable, the amount by which the estate and inheritance taxes assessed by reason of the death of the Grantor's wife shall be increased as a result of the inclusion of the marital portion of Trust B in her estate for such tax purposes. The Trustees' selection of assets to be sold to pay that amount and the tax effects thereof, shall not be subject to question by any beneficiary. Notwithstanding any other provision of this Agreement, all income of Trust B accrued or undistributed at the death of the Grantor's wife shall be paid to her estate.

(This Trust B is sometimes hereinafter referred to as the Marital Trust.)

15. Section 5.03 of the 1982 Trust Agreement is a specific, affirmative dispositive provision.

16. Section 5.04 of the 1982 Trust Agreement reads:

The Trustees may elect to have a specific portion or all of Trust B, herein referred to as the "marital portion," treated as qualified terminable interest property for Federal estate tax purposes. If an election is made as to less than all of Trust B, the specific portion shall be expressed as a fraction, and the value of the marital portion at any time may be determined by multiplying the value of Trust B at that time by the fraction then in effect. At the time of each payment of principal pursuant to the provisions of subparagraph 5.03(b), the fraction shall be adjusted, first by restating it so the numerator and the denominator are the values of the marital portion and of Trust B, respectively, immediately prior to the payment, and then by subtracting the amount of the payment from each of the numerator and the denominator, except that the numerator shall not be reduced below zero.

17. The 1982 Trust Agreement, at Section 5.06, also provided for the creation of two other trusts to benefit the Decedent's children after the death of the Decedent's spouse. These trusts were called the Doris Severn Lowell Trust and the Mary J. Miller Trust, respectively.

18. Section 7 of the 1982 Trust Agreement is titled "Tax Provisions" and Section 7.01 reads:

In order to enable the Executor or Administrator of the Grantor's estate to discharge the liability of the estate for all inheritance, estate and other succession taxes, together with interest and penalties thereon, the Trustees may, in their sole and absolute discretion, pay to such Executor or Administrator, such an amount or amounts as the Trustees shall, in their sole and absolute discretion, determine. The Trustees shall not be subject to liability to any person or persons on account of any disbursement made by them pursuant to this paragraph, and the Trustees shall have no duty to examine into the legality or enforceability of any claim which said Executor or Administrator alleges to be a

tax or interest or penalty thereon within the meaning of this paragraph. The Trustees shall not be responsible for the application of any funds furnished by them to said Executor or Administrator pursuant to this paragraph.

19. In addition to the affirmative dispositive provisions of the 1982 Trust Agreement, the 1982 Trust Agreement contained a general provision entitled "9. Prohibition Against Alienation." Subsection 9.01, sometimes referred to by the parties as the "spendthrift clause," reads as follows:

No income or principal payable to or held for any beneficiary hereunder shall be alienated, disposed of or in any manner encumbered while in the possession of the Trustees, and if, by reason of any act of any such beneficiary, or by operation of law, or by the happening of any event, or for any other reason except by an act of the Trustees authorized hereunder, any of such income or principal shall, or except for this provision would, cease to be enjoyed by such beneficiary, or if, by reason of an attempt of any such beneficiary to alienate, charge or encumber the same, or by reason of the bankruptcy or insolvency of such beneficiary, or because of any attachment, garnishment or other proceeding, or any order, finding or judgment of court either in law or in equity, the same, except for this provision, would vest in or be enjoyed by some other person, firm or corporation otherwise than as provided herein, then the trust herein expressed concerning such income and/or principal shall cease and determine as to such beneficiary, and all such income and/or principal thereafter during the life of such beneficiary, subject however, to the rights of all other beneficiaries as herein provided, shall be held by the Trustees according to their absolute discretion; but the Trustees meanwhile may pay to or expend for such beneficiary for the maintenance, support, welfare and education of such beneficiary, or of any wife, husband, child or children of such beneficiary, out of such income and/or principal theretofore so held for such beneficiary, such sums and such sums only as the Trustees, in their sole discretion, shall deem proper, using or retaining for the benefit of beneficiaries hereunder whose interests are not so affected, any portion not so expended.

20. Section 9.01 of the 1982 Trust Agreement is a general, non-dispositive provision.

21. The prior version of the 1982 Trust Agreement, which the 1982 Agreement amended, was executed on December 21, 1973 (the 1973 Trust Agreement). The 1973 Trust Agreement also provided for the creation of two trusts, A and B. In the 1973 Trust Agreement, however, the marital trust was the A trust; in the 1982 Trust Agreement, the marital trust was the B trust.

22. The 1973 Trust Agreement provided a dispositive scheme generally similar to the scheme in the 1982 Trust Agreement. Section 5.01 of the 1973 Trust Agreement stated that:

Trust A shall consist of a fraction of the trust estate whose numerator shall be the "marital amount" as defined below, and whose denominator shall be the value of said trust estate determined with values used in the final determination of the federal estate tax upon the grantor's estate. "Marital amount" as used herein means the amount of the maximum marital deduction allowable for the purposes of federal estate tax upon the Grantor's estate, diminished by that portion of the marital deduction, if any, allowable by reason of all interests in property passing to or for the benefit of Grantor's wife without regard to this paragraph 5.01. The balance of the trust estate shall be set aside as a separate trust which shall be designated for convenience, Trust B.

23. Similar to the 1982 Trust Agreement, the 1973 Trust Agreement, in Section 5.06, also provided for the creation of two other trusts to benefit the Decedent's children after the death of the Decedent's spouse. These trusts were also called the Doris Severn Lowell Trust and the Mary J. Miller Trust.

24. The non-dispositive paragraphs of the 1973 Trust Agreement and the 1982

Trusts Agreement (Sections 6 through 13, including all subsections) are virtually identical.

25. In Section 9.01, the 1973 Trust Agreement includes a general spendthrift clause which is identical to the spendthrift clause in the 1982 Trust Agreement, except for two items: (1) the words "and absolute" appear in the fourth to the last line of the 1973 version, but do not appear in the 1982 version; and (2) at the end of the 1973 spendthrift clause there is the following parenthetical sentence: "(This paragraph shall apply only to Trust B but shall not apply to Trust A)." This parenthetical sentence does not appear in the 1982 Trust Agreement.

26. Earlier versions of the Decedent's estate plan, executed in 1963 and 1969, included similar A/B trust arrangements. In these earlier trust agreements, the A trust was the marital trust and the general spendthrift clause provisions did not apply to the marital trust.

27. The impetus for the 1982 amendment to the 1973 Trust Agreement was the change wrought in the area of estate taxation by the Economic Recovery Tax Act of 1981 ("ERTA"). Miller was not motivated in any substantial way, either in 1982 or in 1973, to arrange his Trust Agreements or other testamentary documents so that he could maintain control over Precision Metalsmiths and Pre-Vest, the companies he had founded, after his demise.

28. The Decedent was advised by his tax advisors, Henry Levy and James Conway, that ERTA created an unlimited marital deduction that could be employed to minimize estate tax liability.

29. The Decedent was further advised by Henry Levy and James Conway that ERTA allowed Decedent to control the ultimate disposition of his assets upon the death of his surviving spouse by use of a "QTIP" trust, which qualifies for the marital deduction for federal estate tax purposes.

30. With the changes made to the 1973 Trust Agreement by the 1982 Trust Agreement, Decedent intended to thoroughly exploit the opportunity of estate tax deferral allowed under ERTA by taking full advantage of the new unlimited marital deduction.

31. Both James J. Conway and Keith Kern discussed the Decedent's wishes with him and were aware of his intentions at the time he executed the 1982 Will and 1982 Trust Agreement.

32. The reason that the 1982 spendthrift provision does not have as its last sentence "This paragraph shall apply to Trust A but shall not apply to Trust B" is due to scrivener's error on the part of Keith Kern, the drafter of the 1982 Trust Agreement. Mr. Kern inadvertently deleted this critical sentence from the 1982 Trust Agreement during repeated wordprocessing revisions. Mr. Kern's editing marks were misunderstood by his then secretary, Ms. Deborah Spence, and Mr. Kern never intended to direct Ms. Spence to delete this limitation from the spendthrift clause.

33. The decedent's intent at the time he executed the 1982 Will and the 1982 Trust Agreement was to take full advantage of ERTA's changes to the marital deduction, by having the marital trust, or B Trust, qualify as Qualified Terminable Interest Property as expressed by Sections 5.03 and 5.04. The testator did not intend for the spendthrift provision in Section 9.01 to apply to the marital trust created in Sections 5.03 and 5.04.

34. The 1982 Trust was funded with $10,607,800 prior to Decedent's death (the "Lifetime Funding Amount").

35. The 1982 Trust Agreement governed the administration of the Lifetime Funding Amount, both during Decedent's lifetime and after his death.

36. Following the Decedent's death, the 1982 Will was admitted to probate in the Court of Common Pleas of Cuyahoga County, Ohio, Probate Division, on December 21, 1984.

37. The Executor of the Estate of Robert R. Miller (the Executor) timely filed a Form 706, United States Estate Tax Re-

turn, with the Internal Revenue Service ("IRS") on September 18, 1985.

38. On December 15, 1985, the Executor timely filed an amended Form 706, United States Estate Tax Return, with the IRS.

39. On the Amended Form 706, the Executor made a proper election, pursuant to I.R.C. § 2056(b)(7) ("QTIP" election), to claim a marital deduction for property transferred into the marital trust (the B Trust).

40. The QTIP election made by the Executor on the Amended Form 706 was in the amount of $10,424,734.97, which amount was mainly comprised of closely-held stock.

41. The remaining marital deduction claimed on the Amended Form 706, pursuant to I.R.C. § 2056, was $208,219.14.

42. The federal estate tax which was reported and paid with the amended Form 706 was $588,291.09.

43. The IRS audited the Amended Form 706 and determined that the Marital Trust did not qualify as Qualified Terminable Interest Property under I.R.C. § 2056(b)(7), having concluded that the general spendthrift clause violated I.R.C. § 2056(b)(7)(B)(ii)(I) and/or (II). Thus, the IRS disallowed the marital deduction in the amount of $10,424,-734.97, and determined that Decedent's estate owed an additional estate tax in the amount of $5,295,298.63.

44. On June 24, 1988, the Estate timely filed a Form 843, Claim for Refund, in the amount of $5,294,298.63 plus interest, which the estate had paid on or about May 13, 1988.

45. On December 14, 1988, the IRS notified the Estate that the Claim for Refund was disallowed in full.

46. The Estate of Robert R. Miller timely instituted this action for refund on December 21, 1988.

47. On November 22, 1991, the Cuyahoga County Commons Pleas Court, Probate Court Division, entered a judgment in a declaratory action which reformed the 1982 Trust Agreement, and specifically the general spendthrift clause. The Probate Court's reformation added, at the end of the general spendthrift clause in Section 9.01, the following parenthetical sentence: "(This paragraph shall apply to Trust A, but shall not apply to Trust B.)"

48. The Probate Court found, by clear and convincing evidence, that: (1) the Decedent's intent was to minimize estate taxes by taking advantage of the marital deduction; and (2) the omission of the parenthetical sentence was an inadvertent error.

49. The property which funded the marital trust passed from the Decedent.

50. Doris A. Miller has, since the date the property passed from Robert R. Miller to the marital trust, been entitled to all of the income from the property held in the marital trust, payable at quarterly intervals, and has a usufruct interest for life in the marital trust.

51. No person, other than Doris A. Miller, has a power to appoint any part of the property in the marital trust.

52. During his lifetime, Robert R. Miller caused to be transferred to the Robert Miller Trust 432 shares of Precision Metalsmiths, Inc. and 100 shares of Pre-Vest, Inc.

53. The aggregate value of the stock transferred to the Robert Miller Trust was in excess of $10,000,000.00 (the "Life Time Funding Amount").

54. The non-marital trust (Trust A) was funded with 63.593 percent of the Pre-Vest, Inc. stock upon the death of Robert R. Miller.

55. The value of Pre-Vest, Inc. stock allocated to the non-marital trust (Trust A) was $2,000,000.00 at the time of Robert R. Miller's death.

56. Subsequent to Miller's death, the value of the assets allocated to the non-marital trust (Trust A) increased as a result of the appreciation in value of the Pre-Vest, Inc. stock. This appreciation was realized at the time of the sale of the stock in November of 1985, and as a result of the allocation of income from Pre-Vest, Inc.

57. The combined amount of the appreciated value and interest income raised the value of assets allocated to Trust A in excess of $2,500,000.00.

58. The federal and Ohio estate taxes that were paid in 1985 and 1986 totaled $1,011,925.12.

59. The trustee apportioned the entire $1,011,925.12 to the non-marital trust (Trust A).

60. All income from the marital trust (Trust B) was available to Mrs. Miller.

61. No funds were transferred from the marital trust (Trust B) to the non-marital trust (Trust A) to compensate for payment of estate taxes out of the non-marital trust (Trust A).

62. In 1982 and at the time of Robert Miller's death, neither Robert Miller nor Doris Miller had any substantial creditors that might have sought to encumber the interests or assets of the marital trust.

63. The trial testimony of Mr. Kern was credible in all material respects, as measured by its internal consistency, its consistency with other evidence submitted at trial, Mr. Kern's demeanor, and all other relevant indicia.

64. None of the documents submitted by plaintiff were forged or purposefully altered in an after-the-fact effort to support plaintiff's claim of scrivener's error.

B. *Conclusions of Law.*

65. The Ohio Supreme Court would have reformed the 1982 Trust Agreement in the same fashion as did the Probate Division of the Cuyahoga County Common Pleas Court in its November 22, 1991 judgment.

66. The 1982 Trust Agreement is ambiguous on its face, because it cannot be read within its four corners without forcing some part of the document to be construed as surplusage.

67. Under Ohio law, the specific affirmative dispositions contained in Section 5 of the 1982 Trust Agreement cannot be and are not defeated by the general spend-thrift provision in Section 9.01 of the 1982 Trust Agreement.

68. The marital or B Trust in the 1982 Trust Agreement qualifies as Qualified Terminable Interest Property under I.R.C. § 2056(b)(7).

69. Plaintiff, the Estate of Robert R. Miller, is entitled to a marital deduction attributable to the assets transferred to the marital B Trust in the amount of $10,424,734.97.

70. Plaintiff, the Estate of Robert R. Miller, is entitled to a refund of estate taxes paid in the amount of $5,294,298.63, plus statutory interest from June 24, 1988, computed under I.R.C. § 6621(a)(1).

71. Ohio Revised Code § 2113.86 applied to determine apportionment of estate taxes of Decedent's estate.

72. Federal estate taxes paid on Decedent's estate under the Ohio Apportionment Statute are apportioned to assets other than those qualifying for the marital deduction.

73. Under Ohio law, no estate taxes paid from the assets of the 1982 Trust can be apportioned to the assets of the marital trust created in Section 5.03 of the 1982 Trust Agreement, the B Trust, regardless of the wording of the testamentary documents.

74. Payment of federal and Ohio estate taxes and the allocation of those payments by the trustee to Trust A were in compliance with the terms of the Robert Miller Trust, and Ohio Revised Code § 2113.86.

75. The actual administration of the Robert Miller Trust was appropriate to qualify the marital trust (Trust B) property as qualified terminable interest property, eligible for the marital deduction.

**IT IS SO ORDERED.**